Filed 9/11/14  In re A.A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.A., a Person Coming Under the Juvenile Court Law. | D0065436 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1154) |
| v. | |
| OTIS A. et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of San Diego County, Cynthia Bashant, Judge.  Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant Otis A.

Grace Clark, under appointment by the Court of Appeal, for Defendant and Appellant Clara B.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Georgia Gebhardt, Deputy County Counsel, for Plaintiff and Respondent.

Otis A., the presumed father of four-year-old girl A.A., appeals a judgment declaring A.A. a dependent of the juvenile court under Welfare and Institutions Code section 300, subdivision (b),[1] and removing her from parental custody under section 361, subdivision (c)(1). A.A.'s mother, Clara B., also appeals the judgment removing A.A. from parental custody. Otis challenges the sufficiency of the evidence supporting the court's jurisdictional findings and order, and both parents challenge the sufficiency of the evidence supporting the removal of A.A. from the parents' custody when less drastic alternatives ostensibly were available. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Just after midnight on January 2, 2014, police arrested both parents after an undercover officer purchased $30 worth of methamphetamine from Otis. The officer had first contacted a friend of Otis, who used the officer's phone to call Clara to arrange the meeting. When the officer purchased the drug from Otis, Clara was standing across the street with A.A., who was wearing a thin, short-sleeved shirt and was shivering. Otis admitted that another bindle of methamphetamine that had fallen when he attempted to flee police belonged to him. Clara's phone had text messages that suggested to police she had been involved in other drug sales. Police transported the parents and A.A. to the police station.

---

[1] All further statutory references are to the Welfare and Institutions Code.

A San Diego County Health and Human Services Agency (Agency) social worker interviewed Clara at the police station. Clara stated she and A.A. lived in an apartment downtown. Clara said she and A.A. saw Otis about once or twice per week, except A.A. occasionally only saw him every two weeks. Clara was unemployed, received public assistance, and was concerned that she would lose that public assistance because of her arrest for drug sales. She denied being involved in the drug sale and denied knowing Otis sold drugs. When asked about the text messages, Clara said she used her phone "to buy weed," but added Otis also used her phone. Clara admitted to occasional recreational use of marijuana when A.A. was not present, most recently just days before her arrest.

The social worker also interviewed Otis at the police station. Otis stated he did not live with Clara and A.A., but instead moved from hotel to hotel and was currently homeless. He said he visits A.A. every day and supports her with the public assistance funds he receives. Otis denied any prior drug sales and explained he only engaged in the current sale because he "found" the methamphetamine. He denied Clara was involved in the drug sale and explained she was only present because he asked her to meet him so he could go home with her. Otis admitted to prior cocaine use and related arrests, but completed drug rehabilitation treatment in 2002 or 2003. He denied using methamphetamine, but admitted to smoking marijuana daily.

After the parents' interviews, the social worker transported A.A. to Polinsky Children's Center.

On January 6, 2014, the Agency filed a petition on behalf of A.A. under section 300, subdivisions (b) and (g). Under subdivision (b), the Agency alleged A.A.'s parents

3

left her inadequately supervised in that the parents were arrested and taken into custody for sales of a controlled substance. The petition further alleged A.A. was present during the drug sale exchange and was at substantial risk of suffering serious physical harm or illness. Under subdivision (g), the petition alleged both parents were incarcerated and were unable to arrange appropriate and adequate care.

At the January 7, 2014, detention hearing, the court made a prima facie finding on the petition and detained A.A. in out-of-home care. The court denied Clara's request that the court authorize the Agency to detain A.A. with Clara upon her release from custody.

Later that day, Clara was released from custody without charges having been filed. Otis was still in custody and expected to be sentenced to six months in jail. A.A. was detained with her paternal aunt.

On January 9, 2014, Clara made an unannounced visit to the social worker. Clara stated she no longer wanted to be in a relationship with Otis "because it will look bad on me and my focus is on my child." She denied using methamphetamine, but again admitted to using marijuana two to three times per week to cope with the stress of providing for herself and A.A. She acknowledged using marijuana with Otis. Clara stated she felt she would benefit from receiving services and was willing to complete a substance abuse assessment. She also stated she needed a job to maintain safety and stability for A.A.

On January 14, 2014, a social worker visited Clara at her studio apartment. The social worker noted the apartment was very small but was clean and had resources to provide for A.A.'s basic needs. Clara informed the social worker that her cash aid had

4

been discontinued as a result of A.A.'s removal. Clara continued to be willing to complete services and cooperate with the Agency, and stated she had started a six-week parenting program at City College. Clara admitted she had commented to another individual, "I just need to kiss everyone's ass in order to get my child back." The social worker asked Clara to take a drug test; Clara agreed and tested positive for marijuana.

On January 16, 2014, Clara made another unannounced visit to the social worker. Clara stated she only had housing lined up through the end of February because her public assistance benefits had been cut off. She informed the social worker she intended to obtain a "legalization marijuana card," which prompted the social worker to advise Clara to refrain from using any substances at all. Clara said she would get the card but not use marijuana. Clara denied being in a relationship with Otis and claimed A.A.'s welfare was more important to her than a relationship and communication with him. Clara said she would keep A.A. safe from Otis's drug use by "not allow[ing] him to see the child or his visits would need to be supervised." The social worker informed Clara that the Agency intended to ask the juvenile court to remove custody of A.A. from the parents. Even though law enforcement had dropped criminal charges stemming from Clara's January 2 arrest, the social worker explained she "highly suspect[ed]" Clara was involved in the drug deal.

On January 17, 2014, the social worker met with Otis. Otis reported still being in a relationship with Clara, as evidenced by Clara attending a hearing in his criminal case the previous day. Otis reiterated that he used to visit Clara and A.A. daily. Otis admitted he had actually been selling methamphetamine for the three months preceding his arrest,

5

but denied Clara knew of the drug sales. He continued to deny using methamphetamine, but confirmed he smoked five to six marijuana "blunts" per day, averaging $20 daily. Otis stated he and Clara sometimes used marijuana together and would occasionally leave A.A. alone in a room while they smoked outside. Otis further stated he did not believe his marijuana use affected A.A.'s safety, saying it was not mind-altering like methamphetamine or alcohol.

The social worker's jurisdiction/disposition report recommended A.A. "remain in out-of-home care until the mother is able to demonstrate a clean and sober lifestyle free from substance abuse, drug sales and drug involvement." The social worker expressed concern regarding the dynamics of the parents' relationship; the parents' lack of understanding about the dangers posed to a child in a drug environment involving narcotic sales, including threats, robbery, substance overdose, incarceration, injury, or death; and the parents' lack of concern about the impact their marijuana use could have on their ability to appropriately supervise and care for A.A.

At the February 10, 2014, settlement conference, the parties advised the court they were ready to try the matter that day. The court received in evidence, without objection, the Agency's detention and jurisdiction/disposition reports. The Agency then rested its case and neither parent offered any affirmative evidence. After hearing very brief closing arguments, the court sustained the allegation pursuant to section 300, subdivision (b).[2]

---

[2] Because Clara was no longer in custody, the court dismissed the allegation based on section 300, subdivision (g).

The court removed custody of A.A. from the parents, ordered her placed in the approved home of a relative, and ordered reunification services be provided to the parents.

Both parents timely appealed.

DISCUSSION

I

*JURISDICTION*

A.    *Legal Framework*

At the jurisdictional hearing, the juvenile court determines whether the child is described by one or more subdivisions of section 300. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1432.) Under section 300, subdivision (b), the Agency must show by a preponderance of the evidence that the parent's neglectful conduct has caused the child to suffer serious physical harm or illness, or creates a substantial risk that the child will suffer such harm or illness. (§ 300, subd. (b); § 355, subd. (a).)

We review jurisdictional findings under the substantial evidence standard of review. (*In re A.S.* (2011) 202 Cal.App.4th 237, 244.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133 (*T.V.*).) "The

appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*Ibid.*)

B.      *Analysis*

Otis contends that by the time of the jurisdictional hearing, A.A. was no longer at substantial risk of serious physical harm because the petition was premised on a single incident of harm—A.A.'s presence at the January 2 drug deal—that was unlikely to reoccur despite the parents' admitted marijuana use. We are not persuaded.

We first dispose of Otis's suggestion that the January 2 drug deal was an isolated event. For his part, after initially denying ever selling drugs, Otis eventually admitted to having sold methamphetamine for three months. Because he was homeless during that period, the record supports an inference that he had drugs in his possession when he visited A.A. daily.

As for Clara, substantial evidence indicates she was involved in more than one drug deal. Beginning with the January 2 incident, Otis's friend told the undercover police officer to call Clara's cell phone and told him they were going to meet a female who would have the drugs in her possession. Clara participated in another phone call with the undercover officer just before Otis delivered the drugs and was across the street with A.A. when the transaction occurred. Additionally, although Clara admitted using her cell phone "to buy weed," text messages support an inference that she also used it to sell drugs and coordinate other drug deals for Otis.[3] The fact that law enforcement decided,

---

3      The court was free to disbelieve Clara's statement to social workers that Otis also used her phone.

for whatever reason, not to charge Clara criminally in connection with the January 2 drug deal does not negate the substantial evidence of Clara's involvement in that or other drug deals for purposes of this dependency proceeding.

Substantial evidence also indicates there was a substantial risk the parents would continue their illicit drug activity. To begin with, although Clara claimed she intended to stop using marijuana, she also said she intended to obtain a "legalization marijuana card." When she and Otis used marijuana together, they left A.A. unattended. Clara's worsening financial condition also supports an inference that she would continue selling drugs as a means of supporting herself and A.A. Clara was unemployed and was going to lose her housing at the end of February because of her drug arrest and resultant removal of A.A.[4] And Otis was incarcerated and expected to remain so "for some time." Thus, Clara's financial condition was even worse than it was when she previously sold drugs.

Clara's insincerity and demeanor during the dependency proceedings further supports the juvenile court's jurisdictional findings and orders. She admitted to a social worker that she said "I just need to kiss everyone's ass in order to get my child back." Similarly, she told a social worker she no longer wanted to be in a relationship with Otis "because it will look bad on me," and Otis stated they were still in a relationship—so much so that Clara attended his criminal case hearing on the same day she told the social worker their relationship was over. The juvenile court also remarked during the

_____

[4]    Clara's counsel asserted during the jurisdiction and disposition hearing that Clara was working full time, but no evidence in the record supports that assertion.

jurisdiction and disposition hearing that Clara's body language indicated she was "feeling pretty resistant at this point."

The extent of Clara's participation in services by the time of the jurisdiction and disposition hearing does not negate the substantial evidence discussed above. She had enrolled in a six-week parenting class at City College, but it is unclear from the record whether she completed that class or whether the class addressed the drug-related issues that led to this dependency case. In addition, despite her agreement with the case plan's requirement that she meet with a substance abuse specialist, Clara still had not done so. She also tested positive for marijuana during the dependency case.[5]

In sum, substantial evidence of the parents' ongoing drug dealing and drug use, Clara's resultant financial condition, and her lack of sincerity and progress in the reunification process support the trial court's jurisdictional findings and order.

## II

### *THE JUVENILE COURT'S DISPOSITION*

A.    *Legal Framework*

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing" to "decide where the child will live while under the court's supervision." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.) "Before the court may order a child physically removed from his or her parent's custody, it must find, by

---

[5]    Otis suggests this was because of her prepetition marijuana use. Although that is certainly one inference that can be drawn, another inference can be drawn that it was based on postpetition marijuana use. Under the substantial evidence standard of review, we draw the inference that supports the judgment. (*T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal." (*T.V.*, *supra*, 217 Cal.App.4th at p. 135; § 361, subd. (c)(1).) The social services agency's report must discuss "the reasonable efforts made to prevent or eliminate removal" (Cal. Rules of Court, rule 5.690(a)(1)(B)(i); *In re Ashly F*. (2014) 225 Cal.App.4th 803, 809 (*Ashly F.*)), and the court "shall state the facts on which the decision to remove the minor is based" (§ 361, subd. (d); *Ashly F*., at p. 809).

"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136.) "In this regard, the court may consider the parent's past conduct as well as present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; *T.V.*, *supra*, 217 Cal.App.4th at p. 133 ["A parent's past conduct is a good predictor of future behavior."].)

We review the court's dispositional findings for substantial evidence. (*T.V.*, *supra*, 217 Cal.App.4th at p. 136.) As we have explained, " 'on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' " (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.)

B.      *Analysis*

Both parents challenge the juvenile court's removal of A.A. Otis contends there was insufficient evidence of substantial risk of harm to A.A. at the time of the hearing,

11

and both parents contend there were reasonable, less drastic alternatives to removal.  We disagree.

The same evidence that supports the juvenile court's jurisdictional findings—which the juvenile court made by clear and convincing evidence even though it was only required to do so by a preponderance—is also sufficient to support the dispositional findings that there is or would be a substantial risk of harm to A.A.'s physical health or safety if not removed from the parents' custody.  (§ 361, subd. (c)(1).)  Moreover, Clara's refusal to acknowledge her role in the drug sales and its impact on A.A.'s welfare further supports the conclusion removal was appropriate.  (*In re Cole C.*, *supra*, 174 Cal.App.4th at p. 918.)  We turn, then, to the sufficiency of the evidence regarding the availability of less drastic alternatives to removal.

We note first that this is a new argument for the parents—they never raised it with the juvenile court in any way.  Indeed, neither parent objected to the Agency's detention or jurisdiction/disposition reports, cross-examined the social worker (or adduced any other affirmative evidence) at the hearing, or otherwise suggested to the trial court that any reasonable alternatives to removal were available.  Instead, relying heavily on *In re Henry V.* (2004) 119 Cal.App.4th 522 and *Ashly F*., the parents now suggest the juvenile court failed to satisfy its duty to consider alternatives to removal and to adequately "state the facts on which the decision to remove the minor is based."  (§ 361, subd. (d).)  We find those cases distinguishable and conclude the juvenile court satisfied its burden under section 361, subdivision (d).

12

In *Henry V.*, the appellate court reversed the juvenile court's removal order of a child who sustained burn marks of undetermined origin and whose mother had bonding deficiencies. (*Henry V., supra,* 119 Cal.App.4th at pp. 527, 531.) The appellate court reasoned the physical abuse was a single occurrence and the mother was fully cooperative in taking advantage of the services offered to her. In addition, the juvenile court premised removal on the need to complete a bonding study but there was no evidence the study could not occur with the child living at home. To the contrary, the social worker testified that in-home bonding services, unannounced visits, and public health nursing services could address the bonding issue and mitigate the risk of further physical abuse. (*Id*. at p. 529.) The appellate court reversed the dispositional findings because there was insufficient evidence to support the order and because it was unclear from the record whether the juvenile court applied the clear and convincing evidence standard when making its dispositional findings. (*Id*. at pp. 529-530.)

Unlike in *Henry V.*, the juvenile court here was not faced with a single incident involving physical injury of an undetermined cause but, rather, was faced with the parents' *ongoing* exposure of A.A. to the dangers of drug dealing and drug use. Additionally, whereas the social worker in *Henry V.* testified that in-home services that could eliminate the need for removal were available, the court here received no such testimony. Finally, in contrast to the uncertainty posed by the record in *Henry V.*, the court here unequivocally made both its jurisdictional and dispositional findings by clear and convincing evidence. *Henry V.* is thus inapposite.

13

In *Ashly F*., the mother physically abused her children and, after the detention hearing, moved out of the family home where the husband remained. (*Ashly F*., *supra*, 225 Cal.App.4th at pp. 806-807.) The disposition report by the Department of Children and Family Services (DCFS) perfunctorily stated there were no " '[r]easonable means' " by which the children could be protected without removal and that " 'reasonable efforts' " were made to avoid removal. (*Id*. at p. 808.) The report did not elaborate other than to say the family was provided with reunification services. (*Ibid*.) The report "did not state that DCFS had conducted the prerelease investigation report on Father as it was directed to do at the detention hearing." (*Ibid*.) The court made no inquiry, and in its order parroted DCFS's assertion that DCFS made reasonable efforts to avoid removal. (*Ibid*.)

The appellate court concluded "DCFS and the court committed prejudicial errors in failing to follow the procedures mandated by the Legislature and the Judicial Council for determining whether the children needed to be removed from their home."[6] (*Ashly F., supra,* 225 Cal.App.4th at p. 810.) *Ashly F*. explains: "By the time of the hearing Father had already completed a parenting class. Furthermore, 'reasonable means' of protecting the children that should at least have been considered include unannounced

---

[6]     The rule of harmless error applies to appellate review of juvenile court rulings. (*In re A.M.* (2014) 224 Cal.App.4th 593, 598; *In re J.S.* (2011) 196 Cal.App.4th 1069, 1078.) "Before any judgment can be reversed for ordinary error, it must appear that the error complained of 'has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) Reversal is justified 'only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*In re J.S.,* at pp. 1078, 1079.)

visits by DCFS, public health nursing services, in-home counseling services and removing Mother from the home." (*Ibid.*)

This case is distinguishable from *Ashly F.* on several grounds. First, unlike the DCFS in *Ashly F.*, the Agency here dedicated two pages of its jurisdiction/disposition report to a discussion of the "reasonable efforts" it undertook to avoid removal. Those efforts included inviting Clara to attend a team decision meeting "to discuss the current placement, services, concerns of why the child was removed from the parents['] care and potential placement of the child with the mother." Clara declined to attend because "she did not think this meeting would [be] benefi[cial] and she wanted to speak to her attorney first to obtain more legal advice."[7] Second, the juvenile court here offered a factual basis (albeit a brief and implicit one) for its removal order beyond merely parroting the Agency's recommendations.[8] That is, by encouraging Clara that if she consistently tested clean for drugs "[t]his is not a case that should take long and should go quickly," the court indicated it was Clara's continuing engagement in a drug lifestyle that formed the basis for removal. (See, e.g., § 300.2 ["The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child."].) Third, the *Ashly F.* juvenile court had the option of removing the offending parent because both parents lived in the same

---

[7] The record does not indicate whether Clara asked if her attorney could also attend the meeting.

[8] The brevity of the statement might be a result of the parties' stipulation to try the matter on the papers and the brevity of the parties' closing arguments.

15

home, whereas that option does not exist here because Otis is incarcerated and Clara is also an offending parent.

Clara also likens this case to *In re Basilio T.* (1992) 4 Cal.App.4th 155 in which the Court of Appeal reversed the juvenile court's removal order. The cases are not alike. In *In re Basilio T.*, the appellate court reversed the removal order because it appeared to be based in part on incompetent evidence that should not have been considered by the juvenile court. (*Id.* at pp. 167-168.) In addition, the appellate court found that the only admissible evidence in the record that could have supported the dispositional order concerned two domestic violence incidents that did not involve the children and did not directly affect them. (*Id.* at p. 171.) Here, by contrast, Clara did not object to the admissibility of the agency's reports, nor does she challenge their admissibility on appeal. Further, Clara's ongoing drug lifestyle directly affected A.A.—in fact, Clara brought A.A. to at least one drug deal and left A.A. unattended while Clara and Otis used drugs together.

On the record before us, we conclude the Agency's showing and the court's statement of facts were satisfactory. Even if there were arguably any deficiency in the removal order, it was harmless error "because it is not reasonably probable such findings, if made, would have been in favor of continued parental custody." (*In re Diamond H.*, *supra*, 82 Cal.App.4th at p. 1137.)

DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:

O'ROURKE, Acting P. J.

AARON, J.